# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-0307V

| | |
|---|---|
| STEPHEN COTE,<br><br>             Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>             Respondent. | Chief Special Master Corcoran<br><br>Filed: September 2, 2025 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Camille Michelle Collett, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On January 7, 2021, Stephen Cote filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza ("flu") vaccine he received on October 11, 2019. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree on the amount of compensation after a period of negotiation, and so the matter was directed to a "Motions Day" determination, which occurred on August 22, 2025.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the total amount of **$40,000.00 for actual pain and suffering.**

I. **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.,* No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to

document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993). The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## II.   Prior SIRVA Compensation Within SPU[3]

### A.   Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2025, 4,983 SPU SIRVA cases have resolved since the inception of SPU more than ten years before. Compensation has been awarded in the vast majority of cases (4,817), with the remaining 166 cases dismissed.

2,744 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[4] In only 310 of these cases, however, was the amount

---

[3] All figures included in the Decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[4] The remaining 2,073 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

4

of damages determined by a special master in a reasoned decision.[5] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[6]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[7] Agreement** |
|---|---|---|---|---|
| **Total Cases** | 310 | 2,403 | 31 | 2,073 |
| **Lowest** | $25,000.00 | $4,000.00 | $37,013.60 | $1,000.00 |
| **1st Quartile** | $67,020.04 | $60,000.00 | $90,000.00 | $30,000.00 |
| **Median** | **$91,290.04** | **$79,444.74** | **$115,772.83** | **$50,000.00** |
| **3rd Quartile** | $125,000.00 | $106,293.26 | $161,501.20 | $75,000.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 310 SPU SIRVA cases in which damages were determined via reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $25,000.00 to $215,000.00, with $90,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from

---

[5] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,403 cases) or stipulation (31 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[6] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[7] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

$250.00 to $1,500.00.[8] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[9]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### III.     Relevant Factual History

Petitioner received a flu vaccine in his left arm on October 11, 2019. Ex. 1 at 2. He recalled that the administrator arrived at the pharmacy immediately before his

---

[8] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[9] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

appointment and appeared "flustered." Ex. 5 at ¶1. He "noticed right away how high up on the shoulder it was." *Id*.

On November 13, 2019 (33 days post-vaccination), Petitioner saw his primary care provider ("PCP"). Ex. 3 at 8. He reported having his flu shot on October 11th – and that within a day or two, he had developed pain in his shoulder that had worsened over the past month. *Id*. at 9. He reported trouble with driving and laying on his left shoulder, and that he could not do his morning stretches or his routine at the gym. *Id*. On exam, his range of motion was normal, but with discomfort in all planes. *Id*. He was referred to physical therapy. *Id*.

Petitioner began physical therapy on December 11, 2019. Ex. 2 at 24. He reported that his pain (2-3/10) began after his October vaccination, and had been constant since then. *Id*. At his fifth and last visit on December 27, 2019, Petitioner reported "feeling good." *Id*. at 11. He had not yet met his goals, but did not return. *Id.*

Petitioner returned to his PCP for a telehealth visit on April 30, 2020 (3.5 months later – and more than six months from his reported onset). Ex 3 at 11. He reported that he was still having left shoulder pain, especially when sleeping, sitting, and his gym routine. *Id*. at 12. On exam, his range of motion was normal "with discomfort after 90 degrees of abduction." *Id*. The doctor suspected "possible tendinitis/calcific tendinitis" and ordered an x-ray. *Id.* at 13. The doctor noted that Petitioner may need a referral to an orthopedist and a steroid injection. *Id*.

Petitioner returned to his PCP for unrelated health issues on May 6, 2020 (dental abscess), September 4, 2020 (annual visit), September 8, 2021 (annual visit), and March 16, 2023 (annual visit). *See* Ex. 8. None of these visits document any complaints of left shoulder pain. During those visits, Petitioner expressed no significant concerns other than some lip blisters and a short episode of chest pain. *Id*. Petitioner explained that he "did not feel a need to discuss [his] ongoing shoulder pain with [his] Dr. during these visits, as he did not ask, and [his] shoulder condition had already been reported and addressed." Ex. 12 at ¶1.

On March 25, 2024 (3.5 years after vaccination), Petitioner returned to his PCP for left shoulder pain. Ex. 9 at 1. He reported left shoulder pain since 2020 that "bothers [him] about 50% of the time." *Id*. at 2. He noted that he had tried physical therapy in the past, and "more recently home stretches/exercises." *Id*. He reported limited range of motion due to pain and pain with overhead reaching, sleeping on his left side, and upper body strength training. *Id*. On exam, he had full active and passive ROM, but pain with internal rotation and above 90 degrees of resisted flexion. *Id*. at 4. The doctor suspected either a rotator cuff injury, bursitis, or impingement. *Id*. at 5-6. Petitioner requested a referral to

PT, which was given. *Id*. at 2, 5-6. Petitioner explained that he "felt it was important to go back to [his] doctor to make clear that [he] continued to have symptoms and to obtain documentation that [he] still [has] ongoing shoulder pain." Ex. 12 at ¶4.

Petitioner returned to physical therapy on April 9, 2024. Ex. 10 at 14. He reported that he had a vaccination in 2019 which caused "significant shoulder pain." *Id*. Petitioner stated that he had previously participated in therapy, but felt he was able to perform exercises and manage symptoms on his own. *Id*. He said his symptoms were manageable, but "have now started to increase." *Id*. He had five sessions before discharge. *Id*. at 3. At his last visit on May 10, 2024, he continued to report minor discomfort. *Id*. at 5.

In his supplemental affidavit filed in August 2024, Petitioner explained that he spends one-third of his time with his pain at 7/10, 5/10, and 2/10 respectively. Ex. 11 at ¶1. He stated that he has "tried physical therapy multiple times over the past 5 years but that has not relieved the symptoms." *Id*. at ¶2. He reported ongoing pain with reaching upward and overhead, sleeping on his left side, and exercising. *Id*. He explained that he was an avid bike rider and has had to modify the way he rides to limit the way his body turns on the bike to avoid worsening his pain. *Id*. at ¶3. He expressed his frustration at his injury and its impact on his life and his concern that "[he's] going to have this pain in [his] shoulder for the rest of [his] life." *Id*. at 4.

Petitioner filed another supplemental affidavit on August 15, 2025, to provide an update as to his current condition. Ex. 13 at ¶1. He stated that on average he has left shoulder pain of 5/10, and that he feels that "the strength of his left arm is no longer what it was before." *Id*. at ¶2. He noted that he rides his bicycle 30 miles each day, but that his symptoms are increasingly worse when he does so. *Id*. at ¶2-3. He described an accident that occurred on June 26, 2025, while riding his bike where he removed his left arm from the handlebars and was riding with one hand when he hit a bump, fell, and fractured a rib. *Id*. at ¶4. Petitioner reiterated that his providers have not offered him any treatment options other than surgery and/or medication "to mask the pain," which he does not want. *Id*. at ¶5. He says he has grown to accept the pain, has learned to live with it, "but wishes none of this had ever happened." *Id*. at ¶6.

## IV. The Parties' Arguments

### a. Petitioner

Petitioner seeks an award of $200,000.00 for past pain and suffering. Mot. at 4. He argues that he "has been, and continues to be, acutely aware of the physical pain and suffering he has endured as a result of his SIRVA." *Id.* at 6. He highlights the fact that "he

8

has been unable to live his life pain free" including "getting a restful night's sleep," "simple everyday tasks," his gym routine, and riding his bicycle as he previously did. *Id.* at 6-7. He notes that the severity of his injury worsened over time, has continued for more than five years, and continues in the present. *Id*. at 7-8. Petitioner did not cite any prior SIRVA cases as comparable determinations supporting his demand.

      **b. Respondent**

Respondent proposes a lower pain and suffering award of $45,000.00. Resp. at 1. He characterizes Petitioner's SIRVA as "mild and of relatively limited duration." *Id*. at 8. Respondent highlights the treatment course, consisting of five physical therapy sessions, followed by an almost four-year gap in treatment, before five additional treatments. *Id*. He notes that an x-ray was ordered and Petitioner's doctor suggested referral to an orthopedist for a steroid injection, but Petitioner did not pursue further treatment until after the parties had begun discussing settlement in this case. *Id*. at 8-9. Respondent also did not cite any prior SIRVA cases in his original brief, but filed supplemental authority prior to hearing directing my attention to *Gootee v. Health & Human Servs.*, 22-0827V, 2024 WL 5295109 (Fed. Cl. Spec. Mstr. Dec. 2, 2024) to support his proposed award. ECF No. 53.

      **V.   Appropriate Compensation for Petitioner's Pain and Suffering**

When determining the appropriate amount of compensation for a petitioner's pain and suffering, I review the entire record, including all filed medical records and affidavits and all assertions made by the parties in written documents and during oral argument. I also consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

There is no dispute that Petitioner was fully aware of his vaccine-related injury. Mot. at 6-7; Resp. at 8. Further, the record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

The treatment records in this case show that Petitioner had minimal treatment for his SIRVA injury – with two appointments with his PCP and five physical therapy treatments in the first six months after his vaccination, followed by an *almost four-year gap* after which he returned for one appointment with his PCP and five additional physical therapy treatments. *See* Ex. 2; Ex. 3 at 8, 11; Ex. 9 at 1; Ex. 10 at 3. Petitioner did not undergo any imaging, was not prescribed any medications, did not receive any steroid injections, did not see any specialists, and (importantly) did not have surgery – as do

9

many SIRVA petitioners. (Indeed, I rarely award pain and suffering sums even in the *low* six figures if a claimant has not required surgery).

A gap of almost four years in treatment is sizeable, and reasonably taken into account in assessing the severity of a SIRVA injury. Petitioner states that he did not seek additional treatment because his providers have not offered him any treatment options other than surgery and/or medication "to mask the pain," which he does not want. Ex. 13 at ¶5. But Petitioner's PCP expressly discussed the potential for additional treatment, including imaging[10] and seeing an orthopedist for a steroid injection during the April 30, 2020 visit. Ex. 3 at 11-13. Alternatively, Petitioner could have continued with physical therapy[11] or pursued other types of holistic treatment. The fact that Petitioner sought no treatment for nearly four years, despite due opportunity, suggests that his injury was not as severe as he now argues.

Petitioner also argues that his SIRVA injury has had a substantial impact on his life, and particularly on his recreational activities. *See* Ex. 11 at ¶3; Ex. 13 at ¶3-4. He describes, for example, being unable to perform his previous gym routine, and having to modify how he rides his bicycle, which recently caused a fall and a fractured rib. Ex. 13 at ¶3-4. The impact of Petitioner's SIRVA on his ability to participate in the hobbies and activities that he previously enjoyed is relevant to the determination of his pain and suffering. However, there is no evidence here that Petitioner was *no longer* able to enjoy his preferred activities, or job duties for that matter. In fact, Petitioner stated that he rides his bicycle "every day for approximately 30 miles," and that he continued to operate his small business during the course of his injury. *See* Ex. 13 at 3-4; Repl. at 2. Ultimately, the type of life impact that would raise the pain and suffering award to the level requested by Petitioner are not evident from this record.

Petitioner argues that despite the limited evidence of actual treatment, he *believes* he has "suffered a very severe injury, one with an exceptionally long duration of pain, and one that has had an extraordinarily significant impact on his life." Repl. at 2-3. He points to his affidavits as important evidence – deserving of substantial weight - of his symptoms since his vaccination in October 2019. Mot. at 6-8; *See also* Ex. 11-13. However, while testamentary evidence is important in Vaccine Program cases (and therefore entitled to some weight), a petitioner's subjective view of the impact on an injury does not predominate when the totality of evidence is weighed. That totality inevitably includes *medical record evidence of actual/objective treatment*, which often corroborates claims of pain. But if it does not, the fact a Petitioner reports an extreme injury will not be credited.

---

[10] Petitioner's PCP ordered an x-ray, which Petitioner did not pursue. Ex. 3 at 13.

[11] Petitioner did not complete all of the planned treatment and did not meet his therapy goals during either course of physical therapy. *See* Ex. 2 at 11; Ex. 10 at 5.

10

Here, the record is not consistent with a truly life-altering injury. Thus, when Petitioner returned to physical therapy in 2024, he explained that he had previously participated in therapy, but felt he was able to perform exercises and manage symptoms on his own. Ex. 10 at 14. He described his symptoms as "manageable" before recently worsening. *Id.* Petitioner's statements to his physical therapist seemingly contradict his statements in his affidavit and in his argument – that he was almost constantly suffering from pain of 5/10 or more since his vaccination. *See* Ex. 11 at ¶1; Ex. 13 at ¶2. And his extremely limited treatment does not reflect an unusually painful or difficult SIRVA. Claimants with those kinds of experiences inevitably seek treatment continuously, and more often than not require surgical intervention.

Although neither party cited any prior SIRVA cases in their original briefing, both relied on case law during argument. Petitioner proposed *Binette v. Sec'y of Health & Human Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019), in which a petitioner was awarded $130,000.00, plus future pain and suffering, as support for his proposed award. He highlighted the fact that the *Binette* petitioner did not have surgery, but, like Petitioner suffered from years of shoulder pain that could not be resolved. However, that petitioner underwent significantly more medical treatment than did Petitioner, with prescribed medications, specialist appointments, an MRI, steroid injections, and physical therapy - and suffered a documented permanent injury. *Binette*, 2019 WL 1552620 at *3-8. Here, Petitioner's medical treatment was far more limited.

Respondent presented *Gootee v. Sec'y of Health & Human Servs.*, No. 22-0827V, 2024 WL 5195109 (Fed. Cl. Spec. Mstr. Dec. 2, 2024) to support his proposed award. In *Gootee*, the petitioner was awarded $43,000 for a SIRVA injury lasting approximately seven months and requiring visits with both a PCP and an orthopedist, one x-ray, one cortisone injection, and 23 physical therapy treatments. *Id.* at *1-3. Respondent highlighted that the *Gootee* petitioner had more treatment in those seven months, without any gaps, than did Petitioner overall, suggesting that Respondent's proposed award of $45,000.00 should be the highest possible award in this case. Petitioner distinguished *Gootee* in his argument, highlighting the longer duration of his injury, even without formal treatment, and the fact that this claimant enjoyed a pain-free recovery with full range of motion.

When determining pain and suffering amounts in the Vaccine Program, I am required to fashion awards that are supported by the evidence, regardless of the proposals of the parties. Here, the evidence not only does not support an award as high as Petitioner requests, but also even less than Respondent has proposed. I am not bound, of course, by what the parties propose as damages, but at the end of the day am required to determine what would be *reasonable* – and here, I find that a sum lower than even

11

Respondent's proposed award is most reasonable, in light of the evidence.

Petitioner's treatment course suggests a very mild SIRVA. There is simply not sufficient evidence of the type of extraordinary circumstances that are necessary to elevate a SIRVA injury to the award suggested by Petitioner. While I give some weight to Petitioner's statements that he continued to experience symptoms as time passed, the severity claimed in those statements is not corroborated by medical records – and the fact that Petitioner did not seek any form of treatment for a lengthy timeframe undermines the conclusion that in fact Petitioner's injury was as severe as alleged.

Overall, considering the arguments presented by both parties in their briefs and at the hearing, a review of the cited cases, and based on the record as a whole, I find that **$40,000.00** in compensation for past pain and suffering is reasonable and appropriate in this case.[12]

### Conclusion

In light of all of the above, I award **Petitioner a lump sum payment of $40,000.00 for actual pain and suffering to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner, Stephen Cote**. This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[13]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[12] Because this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[13] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.